LittletoN, Judge,
delivered the opinion of the court:
By an act of March 2, 1929, 45 Stat. 1508, which was amended April 19, 1930, 46 Stat. 225, Congress authorized the Secretary of War to arrange for pilgrimages to cemeteries in Europe and return for mothers and Avidows of deceased members of the military and naval forces of the United States whose remains were interred in such cemeteries. Pursuant to this act, as amended, the Quartermaster General, acting for and under written authority from the Secretary of War, after preliminary conferences and negotiations with plaintiff, formally, accepted plaintiff’s combined proposal dated March 29, 1930 (finding 17), for transporting white and colored mothers and widows • on these voyages to Europe and return.
Transportation charges made and paid for transportation of colored mothers and widows to Europe and return are not involved in this suit.
The facts Avith reference to the conferences and negotiations between plaintiff and the Quartermaster General, the proposals submitted by plaintiff between June 19, 1929, and March 29, 1930, and the correspondence with reference thereto between the Quartermaster General and the plaintiff are set forth in the findings.
Section 2 (c) of the act of March 2, as amended, provided that “The pilgrimages shall be made at such times during the period from May 1, 1930, to October 31, 1933, as may be designated by the Secretary of War.”
Subdivision (e) of that section provided that “The pilgrimages shall be by the shortest practicable route and for the shortest practicable time, to be designated by the Secretary of War. No mother or widow shall be provided *799 for at Government expense in Europe for a longer period tban two weeks from the time of disembarkation in.Europe to the time of reembarkation in Europe, except in case of illness or other unavoidable cause. * * *. In the case of any mother or widow willfully failing to continue the pilgrimage of her particular group, the United States shall not incur or be subject to any expense with regard to her pilgrimage after such failure.”
Section 3 of the 1929 Act authorized an appropriation of such sums as might be necessary to carry into effect the provisions of the act and directed the Secretary of War to make an investigation for the purpose of determining (1) the total numbers of mothers and widows entitled to make the pilgrimages, (2) the number of such mothers and widows who desire to make the pilgrimages and the number who desire to make the pilgrimages during the calendar year 1930, and (3) the probable cost of the pilgrimages to be made. The Secretary of War was directed to report to Congress the result of such investigation not later than December 15, 1929. Subdivision (a) of section 3 inserted by the amendment of April 19, 1930, provided that “In carrying into effect the provisions of this Act the Secretary of War is authorized to do all things necessary to accomplish the purpose prescribed, by contract or otherwise, with or without advertising, * *
With respect to the transportation of white mothers and widows, it was agreed between plaintiff and the Quartermaster General, acting for the Secretary of War, among other things, that (a) Cabin accommodations should be provided on plaintiff’s vessels “at tariff rates for the accommodations occupied east- and west-bound”; (b) payment for transportation should be made on Government Transportation Order when east- and west-bound tickets for each sailing were issued by plaintiff and turned over to defendant’s designated representative; and (c) six weeks before each sailing plaintiff was to be advised of the definite number of pilgrims to be carried and of the space remaining on the east- and west-bound trips which could be released for sale by plaintiff to the public.
*800 Plaintiff’s proof shows that tickets issued by it for pilgrimages of the Gold Star Mothers and Widows to Europe and return were issued to each passenger in the same way as round-trip tickets were issued to the public. The tickets for the round trip of each of the mothers and widows on each sailing were issued by plaintiff at the same time on Government transportation requests — the eastbound tickets being retained by plaintiff and the west-bound tickets delivered to defendant for holding by defendant’s .contact officer on each vessel for use of the pilgrims on the return west-bound voyage. All of the voyages by the Gold Star Mothers and Widows were round-trip voyages and were so understood by the parties.
Plaintiff’s tariff in effect during 1931 set forth the rates for one-way fares, east- and west-bound during the summer, or “high-season,” and during the “off-season.” Plaintiff’s tariff also provided as follows:
Pound trip rates apply during “off-season” — Eastbound, July 16th to May 15th, inclusive; West-bound, Oct. 1st to July 31st, inclusive. Pound trip rates for berths above, minimum is made by deducting 12% from ' combined East-bound and West-bound fares.
Plaintiff contends that under the language of item 1 of the agreement of the parties dated March 29, 1930 (finding 17), whereby plaintiff agreed “to provide Cabin accommodations in the number and on the vessels indicated on the attached list at tariff rates for the accommodations occupied east- and west-bound,” the discount of 1£ percent for any round trip or one-way trip in “off-season” was not applicable to the transportation of Gold Star Mothers and Widows, and that the government erroneously deducted and retained $76,979.28 from the total of the full-face tariff rates east- and west-bound for the stateroom accommodations occupied east- and west-bound by the Gold Star Mothers and Widows.
In the alternative, plaintiff contends that if the court should conclude that the government is entitled to a discount it should hold that such discount is restricted under the agreement, the tariff, and the Conference Agreement *801 (finding 26) of the Trans-Atlantic Passenger Conference to 12 percent of the coiñbined one-way fares on round trips made in “off-season” and give plaintiff judgment for •$59,016.48, which is the discount taken by defendant from the full one-way tariff rates on one-way travel in the “off-season” period.
Finding 87 shows that of the total amount of $77,209.86 originally deducted by defendant from plaintiff’s bills at full-face tariff rates, east- and west-bound, the sum of $17,953.80 represented 12 percent of combined one-way fares east- and west-bound where the round trip was made in the “off-season,” and the balance of $59,954.46 of the total sum deducted represented 12 percent of the one-way portions of full-face tariff fares for trips made in “off-season” by those pilgrims who traveled one-way in “off-season” and one-way in “high-season.” The defendant subsequently refunded $928.98 deducted on account of “off-season” travel of Colored Mothers and Widows on the American Merchant Line. The deduction here involved is, therefore, $76,979.28.
As shown by finding 26, the Conference Agreement of the Trans-Atlantic Passenger Conference (Minutes of Meeting No. 4, March 28, 1929) provided for a reduction of 10 percent (made 12 percent for 1930) of the combined one-way tariff fares for round-trip travel during the “off-season”, and the same minutes provided that “If round-trip ticket is issued at the outset and passenger travels one way during the off season and one way during the summer season, the reduction of 10% will be allowed on the off season one-way fare.” The language of the Agreement of March 29, 1930, between plaintiff and defendant that plaintiff would provide cabin accommodations at tariff rates for the accommodations occupied east- and westbound is consistent with the above-quoted discount provisions in the 1930 tariff and the Conference Agreement of the Trans-Atlantic Passenger Conference which provided for the discount taken by the government. There is no evidence to indicate that the language of the Agreement of March 29 just referred to was intended or understood by both parties to the Agreement to exclude the 12 percent dis *802 count, as deducted from full tariff rates, from being claimed by the government. The pilgrimages of the Gold Star Mothers and Widows were made round trips by the act under which the Agreement was made. Both parties understood that each pilgrim was to make the round trip, and round-trip tickets were issued and were usually paid for in each case before the east-bound sailing. In every instance the official government transportation requests, which were the equivalent of cash, were issued for the round-trip tickets before the east-bound sailing. In addition to what has just been said, there is evidence to show that in the negotiations on and after June 7, 1929, which culminated in the Agreement of March 29, 1930, the government intended, even if plaintiff did not, that the rates to be paid for the voyages to Europe and return were to be tariff rates, and it is admitted by plaintiff that the term “tariff rates,” without more, means the one-way fares shown on the tariff less the discount provided therein for “off-season” travel. So far as the evidence shows the only occasions on which the matter of tariff rates and the discount for “off-season” travel were mentioned in the negotiations were, first, in plaintiff’s original proposition of June 19, 1929 (finding 4), in the fourth paragraph of which it called the Quartermaster General’s attention to the fact that if the transportation of Gold Star Mothers and Widows could be provided iff what is termed “off-season” a ten percent reduction, in effect at that time, for round trips in “off-season” would be available, and, in the fifth paragraph, that if travel was one-way in “off-season” and one-way at the height of the season the 10 percent reduction would be~applicable on one-half of the fare; and second, in the eighth paragraph of this proposal the plaintiff, after setting forth the cabin fares in paragraph 7, advised the Quartermaster General that the fares quoted were the gross fares and that if the movement should be in “off-season” the 10 percent reduction could be made; and, third, in the letter of March 18, 1930, from Colonel Gibson, acting for the Quartermaster General; in which he advised plaintiff that as had previously been explained “No official of the Government has the authority to enter into *803 any contract which would commit the Government to the payment of higher rates than those charged the general public.” There was thereafter no further mention of the matter of the discount.
Under the terms of the Agreement of March 29, 1930, and plaintiff’s tariff, we are of opinion that the Government was and is entitled to the full amount of the discount of $76,979.28 taken in making final payment for transportation of white Gold Star Mothers and Widows.
Plaintiff makes the further contention that the Government is estopped under the rule of equitable estoppel from insisting upon the discount for travel during “off season” by reason of the approval and payment of certain vouchers submitted by plaintiff, accompanied by lists of passengers and rates, at full-face tariff fares, without discount, and the waiver by plaintiff on May 26, 1930, in reliance upon that practice of its right to insist upon stateroom-capacity fares for the entire season of the 1930 pilgrimages. We find no basis in the evidence for holding that defendant is estopped to claim the discount in question. The Quartermaster General was the only officer authorized to bind the United States by contract, or conduct amounting to implied .acquiescence, and the evidence fails to show that the Quartermaster General ever expressly or impliedly interpreted the Agreement of March 29,1930, as providing that plaintiff was entitled to full-face tariff rates without discount for “off season” round trip or one-way travel prior or subsequent to May 15 or May 26, 1930, when plaintiff agreed to waive charges on the basis of capacity-occupancy of staterooms, and to charge only the three-in-a-room rate where three people occupied a four-berth room, or the two-in-a-room rate where two mothers or widows occupied a three- or four-berth room. Moreover the evidence shows that at the conference between plaintiff and the Quartermaster General on May 15, as a result of which plaintiff’s letter of May 26 was written, the Quartermaster General advised plaintiff that he desired the maximum possible number of lower berths be assigned for use of mothers and widows and that he was willing to pay full-fare capacity for each room, even *804 if four-berth rooms were occupied by only two mothers. Plaintiff’s waiver of its right to charge capacity-fares for staterooms, whether occupied to capacity or not, was purely voluntary.
Plaintiff is not entitled to recover and the petition must: be dismissed.
on defendant’s counterclaim
The defendant has filed, a counterclaim in which it seeks-to recover from plaintiff, as a hold-over lessee, the amount of $35,014.80 as rent for certain space in a building owned; by the government at 45 Broadway, New York, for the-period January 1 to June 6, 1932, inclusive, with interest-
Plaintiff was a hold-over tenant under an annual contract of lease with the defendant which expired at midnight on-. June 6, 1931.
The defendant contends that plaintiff by holding over- and continuing- to occupy the premises after expiration of' the lease without written renewal thereof, or modification as to rental, by the parties, became, under the law of' New York, a tenant for another year and, as such hold-over-tenant, is liable for the rent for another year, beginning-June 7, 1931, in the amount stipulated in the original lease-agreement and the expired extension thereof.
Plaintiff insists that it is not liable for any portion of the-amount claimed by defendant for the reason that in the circumstances it became a tenant at will, or a tenant from month to month, and that the full monthly proportion of the annual rental stipulated in the original lease and extension of June 6, 1930, for one year, was paid monthly to-December 31,1931. Plaintiff vacated the premises December 8,1931.
The rule relating to landlord and tenant is that if a tenant holds over after expiration of a lease for a definite term under circumstances showing its willingness to continue the existing arrangement and if the lessor accepts rent, thus consenting to continued occupancy without indicating that he contemplates a change in terms, the continued relationship is consensual, and the tenant will be regarded as a tenant for *805 another term according to the circumstances of the previous tenancy. Raymond Commerce Corporation v. United States, 93 C. Cls. 698. Under such circumstances an agreement implied in fact arises. In the present case, however, as disclosed by the findings, that was not the situation which existed between the Fleet Corporation and plaintiff. Between January. and October 30, 1931, a reorganization of United States Lines, Inc., the parent and owner of all the capital stock of plaintiff, was in process between the United States and the officers and directors of United States Lines, Inc., and plaintiff, which reorganization, as shown by the findings, of necessity included the affairs and obligations of plaintiff as the operating company of the ships of United States Lines, Inc., which had been purchased from the United States through the Fleet Corporation in 1929. While it is true that plaintiff as a corporation was not expressly made a party to the reorganization agreement of October 30, 1931, nevertheless its officers and directors were officers and directors of United States Lines, Inc., and, as the operating company of the vessels belonging to United States Lines, Inc., its business, affairs, and obligations were inseparably bound up >vith those of United States Lines, Inc., and became a part of the reorganization under the terms and conditions of the agreement between United States Lines Company, the new company, and the Fleet Corporation. The facts disclose that it was for these reasons that plaintiff did not sign the renewal lease for the year beginning June 7, 1931, proposed by the Fleet Corporation upon expiration of the prior lease of June 6, 1930, although prior thereto, on May 19,1931, the vice president of plaintiff had requested the Fleet Corporation by letter to consent to renewal of lease by plaintiff for another year. No action had been taken on May 19 by plaintiff’s directors concerning a renewal lease.
As set forth in the findings, plaintiff, upon being asked by Assistant General Counsel Skinner of the Fleet Corporation why it had not signed the renewal lease for another year beginning June 7, 1931, advised him in August 1931 that such renewal lease was not signed because of the pending reorganization. Assistant General Counsel Skinner was the *806 representative of the Fleet Corporation in charge of preparation of contracts and leases, and was also in charge of the preparation of the reorganization agreement which was subsequently signed by the Fleet Corporation on October 30, 1931. Nothing further was done or said by the Fleet Corporation or plaintiff after August 1931 concerning occupancy by plaintiff of the premises in question until the reorganization agreement of October 30, 1931, between the United States, represented by the Fleet Corporation, and the United States Lines Company was signed. Between June 6 and October 30, 1931, the status of plaintiff as a tenant was not clear, but under the terms of the reorganization agreement it seems clear that plaintiff became, with defendant’s consent, a month-to-month tenant, which, as the facts disclose, was the first consensual arrangement concerning plaintiff’s tenancy that was had between anyone representing or acting for plaintiff and the Fleet Corporation. The United States Lines, Inc., represented by its officers and directors, was a party to the reorganization, and these officers and directors were also officers of plaintiff. When plaintiff held over after June 6, 1931, the Fleet Corporation had the right, if it so desired, to treat plaintiff as a tenant for another annual term under the previous lease, but the evidence submitted by defendant is not sufficient to show that the Fleet Corporation did this, or that it intended to do so. The circumstances which existed and the conversations between officers and representatives of plaintiff and the Assistant General Counsel of the Fleet Corporation in August 1931 were such as not to show an agreement implied in fact, prior to or at that time, that plaintiff was a hold-over tenant for another year from June 6, 1931.
Counsel for defendant argues that the defendant is not bound by statements as to the terms and conditions of plaintiff’s tenancy as set forth in Exhibit III to the balance sheet prepared by Price, Waterhouse & Co., which was annexed to and became a part of the reorganization agreement as Schedule A, because neither the president nor the assistant general counsel of the Fleet Corporation read that exhibit. We think it is immaterial to the question here whether they did or did not read it; they knew that the balance sheet, of *807 which Exhibit III was expressly made a part, was attached to the agreement and constituted a part thereof. They read the balance sheet and this balance sheet expressly made Exhibit III a part of it. Exhibit III stated, among other things, with reference to the lease which expired on June 6, 1931, and plaintiff’s tenancy, as follows: “Term — month to month basis. Lease terminated June 6, 1931, not renewed but continued on a month to month basis.” The reorganization agreement as signed, which was certainly read by the Fleet Corporation for it prepared it, made the audit, including the balance sheet and the schedules, including Exhibit III, thereto attached, a part of the terms and conditions of the reorganization agreement. The defendant cannot now escape its effect.
Whatever may have been the nature of plaintiff’s tenancy between June 6 and October 30,1931, it was a month to month tenancy on and after the last-mentioned date. Plaintiff’s officers and directors had on October 23, 1931, accepted the terms and conditions of the reorganization agreement, including the Price, Waterhouse & Co., audit as proposed by the United States Lines Company of Nevada. Plaintiff, by remaining in possession after June 6 and until the reorganization agreement was signed on October 30, 1931, was not a trespasser; to say that it was a trespasser after June 6 is to disregard the relevant circumstances.
The defendant is not entitled to recover of plaintiff rental for premises at 45 Broadway, New York, for the full period January 1 to June 6, 1932, but inasmuch as plaintiff’s tenancy when it vacated the premises in December 1931 and paid the rent to December 31, 1931, was a tenancy from month to month, plaintiff was entitled to vacate the premises at the end of any month upon giving defendant thirty days notice of itg intention to do so. The defendant was entitled to thirty days notice. Hand v. Knaul, 116 Miscl. 714, 191 N. Y. S. 667. Plaintiff did not give this notice and defendant is entitled to recover the agreed rental of $6,762.75 for the period January 1 to January 31, 1932.
Defendant is entitled to recover on its counterclaim, and judgment for $6,762.75 will be entered in its favor against plaintiff with interest thereon at 6 per centum per annum *808 from January 1, 1932, the date on which the rent was due and payable, until paid. Defendant is entitled to claim interest. Billings v. United States, 232 U. S. 261.
Plaintiff’s petition is dismissed, and judgment is rendered against plaintiff and in favor of the government on its counterclaim for $6,162.75 with interest at 6 per centum per annum, as above stated. It is so ordered.
Madden, 'Judge; Whitaker, Judge; and "Whaley, Chief Justice, concur.
Jones, Judge-, took no part in the decision of this case.
On plaintiff’s motion for new trial (overruled October 4, 1943) Judge Madden was of the opinion that the case should be remanded for the taking of further testimony.