**UNITED STATES LINES COMPANY,**
Libelant,

v.

**UNITED STATES of America,**
Respondent.

United States District Court
S. D. New York.
March 14, 1963.

New York City, Robert E. Kline, Jr., and Robert H. Binder, Washington, D. C., of counsel.

Robert M. Morgenthau, U. S. Atty. for the Southern District of N. Y., for respondent; Thomas F. McGovern, Gilbert S. Fleischer, Attys. Admiralty & Shipping Section, U. S. Dept. of Justice.

PALMIERI, District Judge.

*Preliminary Statement*

This is a suit to recover freight charges allegedly due pursuant to a written contract for the transportation of automobiles privately owned by military personnel and civilian employees of the Department of Defense. The contract was one of a number of similar agreements negotiated by the Government with common carriers, and contained a schedule of rates for various classifications of Government cargo.[1] It became effective for a particular shipment upon issuance and acceptance of a shipping order on a designated ship.

The rate applicable to the shipment of privately owned vehicles (P.O.V.'s) was almost twice as high as that available to private shippers. This surprising circumstance was due to oversight on the part of the responsible Government representatives, an oversight later compounded by an almost incredibly lethargic realization by Government officials that the vehicles shipped on libelant's vessels pursuant to the contract shipping orders were costing amounts which were exorbitant when compared with the rates available to private persons and automobile companies. The error was finally corrected on August 16, 1957 by cabled orders issued by Admiral Gano, then Chief of the Military Sea Transportation Service. Thereafter, the P.O.V.'s were shipped at the tariff rates generally available to the public, pursuant to Government bills of lading. The shipping orders under the contract were no longer used.

Kirlin, Campbell & Keating, New York City, for libelant; Louis J. Gusmano,

1. Article I of the contract provides in part:
"The Contractor [United State Lines] shall carry cargoes for the Government in any of its regular scheduled Vessels as provided in this contract."

The sole issue in the case relates to the correctness of the shipping rates for the vehicles transported after August 16, 1957. The libelant claims that when the Government shipped P.O.V.'s on its vessels, it was obligated to do so at the high rate set forth in the contract. The Court can ascertain no valid contractual basis for this claim. Furthermore, the McCumber Amendment, 10 U.S.C. § 2631, which requires that the Defense Department be charged no more than the rates available to private shippers,[2] is applicable to the shipments in issue. This not only supported but required the Government's withdrawal of the P.O.V.'s from the contract arrangement, and their shipment at the conference rates available to private parties. Consequently, the libelant's claim must be rejected for reasons of public policy.

The libel must therefore be dismissed, as the findings and conclusions which follow are intended to demonstrate.

*Findings of Fact*

1. Libelant is a common carrier engaged in foreign commerce. At all times material herein, it operated in regular trade routes between east coast United States ports and ports in the United Kingdom.

2. This controversy results from a disagreement as to the rate claimed by libelant for the transportation of automobiles from England to the United States in the period August 16, 1957 to May 31, 1960.

3. The automobiles in question belonged to personnel of the armed forces and to civilian employees of the Defense Department and were transported at the Government's expense. Most of those transported were purchased in Great Britain or elsewhere in Europe. They were shipped to the United States[3] as part of the official movement of Government personnel from a station abroad to a station in the United States. By Defense Department regulation the movement was limited to one car per family per move, and was part of the employee's compensation. From the United Kingdom to the United States, during the summer peak rotation period, about 100 cars were shipped every week or ten days. In winter the number shipped per week dwindled to about 20 to 50 cars.

4. Before May 28, 1956, these automobiles, called P.O.V.'s in the military style for Privately Owned Vehicles, could not be shipped by the Government on privately owned carriers, but were transported on a space available basis on Government owned and operated vessels under the Act of October 29, 1949, 63 Stat. 1020, now 10 U.S.C. § 4748.

5. The Act of May 28, 1956, 70 Stat. 187, 46 U.S.C. § 1241(c) (P.O.V. Act), was passed to permit the Government to use privately owned American carriers in this traffic.

6. As soon as the P.O.V. Act became effective, Military Sea Transportation Service (MSTS) commenced shipping these inbound P.O.V.'s under their shipping order agreements, which provided for carriage by common carrier at class rates when, as and if a shipping order by the Government was issued and if the carrier had the space available. The shipping order agreement with libelant, effective April 1, 1953, is referred to herein as MST 1645. It provided a rate of $.66 per cubic foot for cargo category II, identified as "Unboxed Vehicles and other unusual sized cargo."[4]

---

2. The amendment provides:
    "Charges made for the transportation of [supplies bought for the Army, Navy, Air Force or Marine Corps] by [American flag] vessels may not be higher than the charges made for transporting like goods for private persons."

3. This suit relates solely to P.O.V.'s shipped from the United Kingdom to the United States. The terms "westbound"

or "inbound," wherever used, refer to this traffic.

4. In April of 1953, when the contract first became effective, the "Unboxed vehicle and other unusual sized cargo" rate was $.56½ per cubic foot. This was increased to $.62½ per cubic foot on May 1, 1955, and to $.66 per cubic foot on August 11, 1956.

7. Before August 16, 1957, libelant was offered, carried, and was paid for the transportation of P.O.V.'s at the $.66 per cubic foot rate, except for shipments between May 28 and August 11, 1956, that were carried at the $.62½ rate.

8. At all material times herein, libelant was a common carrier under Tariff 18 of the North Atlantic Westbound Freight Association, filed with and approved by the Federal Maritime Board as Agreement 5830, and was obligated to carry private shipments at the rate set forth in this tariff.

9. Tariff No. 18, just referred to, provided for a rate available to the general public for "motor cars, new and second hand, not packed, privately owned," which was the same for non-contract rate as for a contract rate and was 115 shillings (or $16.10) per weight/measurement ton until August 30, 1957, and 120 shillings (or $16.80) per weight/measurement ton from September 1, 1957 to May 31, 1960. A measurement ton is 40 cubic feet, and the rate translated into cubic feet was $.4025 per cubic foot until August 30, 1957, and $.42 per cubic foot from September 1, 1957 to May 31, 1960.

10. Although these tariff rates were on file with the Federal Maritime Board and open to public inspection at the office of the Federal Maritime Board, the Washington rate staff of MSTS did not know of the existence of this lower rate. The MSTS employee principally responsible admitted that he was derelict in his duty in that regard.

11. In the fall of 1956 an MSTS employee in London, David Paulsen, was asked by a friend to obtain information with respect to the rate of shipment home of a second hand car on a commercial basis. He telephoned Warren Berquist of the United States Lines office and was quoted 120 shillings ($.42 per cubic foot), which included the cost of loading and discharging. The same rate was quoted to Paulsen by Cunard Lines.

12. On a European car of 480 cubic feet or 12 measurement tons, this commercial rate would amount to $201.60, including the cost of loading and discharge; under the MSTS agreement it would amount to $300.00, not including the cost of loading and discharge borne by the Government.

13. About five or six weeks later David Paulsen of MSTS again took the matter up with Warren Berquist of the United States Lines in London and asked if it were possible to assess the commercial tariff rate on his P.O.V. westbound bookings. Berquist explained that he had no authority to do so. Paulsen asked to have his request passed on to the United States Lines office in New York; Berquist did so by a letter dated around January 1957, which has been lost, and received a reply from the general freight traffic manager in January, 1957, which has also been lost. The substance of this correspondence was that management in New York had negotiated this contract with MSTS in Washington; that it was binding and that the contract rates must be assessed. The substance of this reply was communicated to Paulsen.

14. Paulsen of MSTS then returned to Washington, reporting for duty in July, 1957. He called the automobile rate matter to his superior's attention and left on vacation.

15. As a result of Paulsen's report, a cable dispatch was approved by Admiral Gano, was dated and sent on August 16, 1957 to MSTS Elm area, which is the MSTS area command in London, and repeated to P. E. McIntyre, Secretary of the Atlantic & Gulf American Flag Berth Operations, 80 Broad Street, New York, N. Y. Mr. McIntyre was an employee of libelant and there is no dispute that libelant received this notice. After reciting the North Atlantic Westbound Freight Association Tariff Rate 18, the dispatch directs the London command that, "Effective immediately and until further notice commercial shipment of P.O.V.'s will be booked in accordance therewith on GBL basis." G.B.L. is an

abbreviation for Government bill of lading, is separate and distinct from a shipping order used under the MSTS contract, and was used here to indicate that the Government would ship at the conference rather than the contract rates.

16. Since in 1954, at the time MST 1645 was executed, there was no authority to ship P.O.V.'s on anything except Government owned ships, no study was made of the effect, either by way of savings or otherwise, of including P.O.V.'s within the traffic covered by the MST 1645 contract. Three other American flag carriers operating on the same route had similar MSTS contracts, with provisions for the shipment of P.O.V.'s at the same rate. There was no obligation on MSTS to choose libelant as against any other of these carriers for the shipment of a particular batch of cargo, or to use its own Government owned vessels or its vessels under time charter from private owners, or to ship on a Government bill of lading.

17. The position taken by MSTS that it was free to use either the bill of lading tariff rate as filed with the Maritime Board or the negotiated space charter rates, whichever was to the financial advantage of the Government, was made known to the Senate Finance Committee and to the American Merchant Marine Institute, of which libelant is a member, some time before 1955. According to Mr. Wilbur L. Morse, General Counsel to MSTS, this position was well known to the steamship industry. There is persuasive evidence that libelant was aware of this position.

18. The General Counsel of MSTS, who was reviewing and approving officer of all MSTS contracts, advised MSTS and each of the successive admirals who commanded it, that MST 1645 was an "open end," no minimum, master-type contract which did not obligate the Government to ship any cargo with the contractor; that it was not implemented until the issuance of a shipping order of the type and form attached to the contract and adopted mutually by the parties; and further, that there was nothing in the contract which deprived the Government of its right to ship cargo at the tariff rates filed by the common carrier and available to the public.

19. When this P.O.V. issue arose in August 1957, the General Counsel reminded Admiral Gano, then Commander of MSTS, of this long-standing position and advised him that the Government should exercise its legal right to ship the cargo under the tariff filed by the United States Lines as a common carrier.

20. Contract MST 1645 contained a disputes clause, Article 19, which required the contractor to continue performance pending resolution of disputes as to questions of fact by the contracting officer and the Board of Contract Appeals.

21. Contract MST 1645 contained in Articles 9 and 10, clauses by which either party could terminate by giving written notice to the other, termination to become effective 60 days thereafter; and by which either party on 60 days' notice in writing could demand a negotiation of the rates of compensation, and termination if the revised rates were not agreed to by the date fixed in the notice.

22. The libelant did not avail itself of Articles 19, 9 or 10, referred to in Findings 20 and 21. Instead, the libelant carrier endorsed on the Government bill of lading "Freight Rate In Dispute."

23. Libelant executed public vouchers for transportation charges for each of the automobiles carried after the August 16, 1957 change to Government bill of lading with a certification "that the rates charged are not in excess of the lowest net rates available for the Government based on tariffs effective at the date of service" and at the same time and on the same document inserted in a box on the left-hand side the phrase "freight rate in dispute." Libelant's position throughout this litigation, however, has been that the P.O.V.'s were required to be shipped only under the shipping contract, which did not require the submission of a public voucher.

24. The extra amount due under the MSTS contract rate for the P.O.V.'s

which moved for the first 60 days of this dispute, that is to say, for 60 days after August 16, 1957, came to $12,066.80.

25. The total difference between the bill of lading rate and the amount due under the MSTS contract rate, if it were applied to all the P.O.V.'s shipped under Government bills of lading, during the period in dispute is $341,228.82.

26. Arthur Holmes, respondent's expert, who had many years' experience in dealing with shipping costs and rates, made cost studies of comparable cargoes under the conference tariff and the MSTS system. In substance, his studies led him to conclude that there were no outstanding benefits under the MSTS contract; that the general cargo rate was high; that the P.O.V. rate was exorbitant; and that on certain commodities, namely, household effects, baggage, cigars, cigarettes and PX supplies, the MSTS rate was advantageous. The testimony of Arthur Holmes is accepted by the Court as reliable and persuasive. The libelant offered no expert testimony based on similar comparative cost studies and failed to demonstrate that the Government received an overall advantage in the rates or otherwise, under the contract.

27. There is insufficient evidence to demonstrate that during the negotiation of Contract MST 1645 libelant was advised that respondent would be required to ship its goods only at the contract rate and that it could not select any items to go at a conference rate. On the contrary, it was within the fair intendment of the parties to the MST contract that the Government should remain free to make its shipments in the most advantageous manner since Contract 1645 was, in effect, an option to ship at certain rates, rather than a binding obligation to ship at such rates. The libelant did not rely upon any oral representations that may have been made prior to the execution of Contract MST 1645. To the extent that any evidence has been adduced to the effect that representations were made by Government representatives or relied upon by United States Lines representatives, modifying or affecting the terms, conditions or performance of the contract, such evidence is unpersuasive and unworthy of belief.

28. The inclusion of an exorbitant P.O.V. rate in Contract MST 1645 was caused by neglect and oversight on the part of the responsible Government representatives. It resulted in the respondent's payment of substantial sums, during the contract period prior to August 16, 1957, over and above what would have been paid for the same or comparable services under the conference tariff rate. It was at no time contemplated by the parties that Contract MST 1645 was to contain specific rates, both higher and lower than conference rates, with the ultimate aim of averaging out the contract rates with a view to their being lower or substantially comparable to the conference rate schedules.

29. Agreement MST 1645 does not contain any clause by which the shipper agreed to ship all its cargo on libelant's ships, nor by which respondent was bound to ship any specified part of its cargo on libelant's ships.

30. Agreement MST 1645 contains no provision by which the carrier was obligated to make space available; the carrier agreed to carry cargo at the rates specified "provided the [carrier] has space available on the date or between the dates for which cargo is offered." Article 2(b).

31. Libelant did not pursue its possible remedies before the Contracting Officer and the Board of Contract Appeals. It has stipulated as follows:

"(b) Parties agree that primary jurisdiction is not in the Contracting Officer under Article 19, MST 1645 because the resolution of this lawsuit does not turn on 'questions of fact' within the meaning of said Article 19."

32. From and after August 16, 1957 libelant was on notice that MSTS was shipping P.O.V.'s under the conference tariff at the rate available to private owners. There was nothing in MST 1645

to preclude shipments of P.O.V.'s by any private owners at such rate against Government reimbursement.

### Conclusions of Law

1. This Court has jurisdiction over the parties and the subject matter. 46 U.S.C. § 742.

2. Contract MST 1645 was in effect an open end, no minimum, master-type contract, with a 60 day forward rate quotation contemplating a formal offer and acceptance by the parties through a shipping order and subsequent booking. See Tatsuma K. K. K. v. J. T. Hodge & Co., 1926 Am.Mar.Cas. 571 (W.D.Wash.1926); White v. North German Lloyd, 61 Misc. 268, 113 N.Y.S. 805 (App. T. 1908). Without the filing and acceptance of a shipping order there was no binding contractual relationship between the parties with regard to any specific cargo.

3. There was no obligation on the Government to ship these privately owned automobiles as cargoes for the Government under MST 1645, rather than on its own ships or on libelant's competitors' ships, or on libelant's ships at the tariff rate. The Government did not promise to forbear from using the commercial tariff available to the private owners of the automobiles shipped at Government expense as cargoes for the Government.

4. The inclusion in Contract MST 1645 of a P.O.V. rate almost twice that charged to the general public for the same service was the result of oversight and neglect and did not effect a binding and valid obligation on the respondent. After giving clear notice of its intent to ship under the tariff available for the private owner of the automobile, the MSTS command was within its rights and in violation of no terms of the contract. Tatsuma K. K. K. v. J. T. Hodge & Co., supra; North German Lloyd v. Mexican Petroleum, 24 F.2d 46 (5th Cir. 1928).

5. The provisions of the Act of April 28, 1904, 33 Stat. 518, the so-called McCumber amendment, now 10 U.S.C. § 2631, restrict American steamship owners in dealing with the Defense Department to charges not higher than those made for transporting like goods for private persons. The text of the original Act and the legislative history of the Act of 1904, show that Congress intended that the broadest interpretation be given to "coal, provisions, fodder or supplies of any description," 33 Stat. 518. The privately owned automobiles are deemed to be "cargoes for the government" within the terms of Article 1 of the contract involved. The purpose and policy of the McCumber amendment applies to all cargoes for the Government for which the Defense Department pays the Ocean freight. United States v. Georgia Pub. Serv. Comm., 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963). Thus, shipment of the P.O.V.'s at a rate substantially higher than the conference rate was unlawful and contrary to public policy. United States Lines Operations, Inc. v. United States, 99 Ct.Cl. 744, 802–03 (1943), cert. denied, 321 U.S. 775, 64 S.Ct. 616, 88 L.Ed. 1069 (1944) (statement by Government in negotiations that no Government official has the authority to arrange for a rate higher than that available to the public, not questioned by the Court). See also Southern Pac. Co. v. United States, 60 Ct.Cl. 662, 670–71 (1925); Missouri Pac. Ry. v. United States, 71 Ct.Cl. 650, 651, 660 (1931); cf. United States v. Garcia & Diaz, Inc., 291 F.2d 242 (2d Cir. 1961).

7. Even if libelant could validly recover for the transportation of P.O.V.'s after August 16, 1957 at the rate set forth in Contract MST 1645, its maximum damages would amount to $12,066.60, since libelant failed to avail itself of any administrative remedies under Articles 9, 10 or 19 of the contract. The clause of Article 19 requiring the continuance or performance is inapplicable because libelant did not invoke the procedures for the settlement of disputes therein provided.

8. The libel is dismissed with costs.

Submit proposed decree on notice.